(562 P.2d 117)

No. 48,251

Betty A. Swezey, *Appellee,* v. State Department of Social and Rehabilitation Services of Kansas, *Appellant.*

Opinion filed March 11, 1977.

*Bruce Albert Roby* and *Charles V. Hamm*, of Topeka, *Curt T. Schneider*, attorney general, and *Phil Harley*, assistant attorney general, for the appellant.

*Roger L. McCollister*, of Topeka, for the appellee.

ABBOTT, J.: This is an appeal from an order of the district court of Shawnee County granting judgment to Betty A. Swezey, reinstating her to her former position with payment of such salary as has been lost by reason of her dismissal.

Betty A. Swezey, hereinafter referred to as Swezey, was a clerk-typist II at the time her employment was terminated. She had been employed at Topeka State Hospital for nearly 14 years by Social and Rehabilitation Services of Kansas, hereinafter referred to as SRS.

This case involves an intended joke prepared by Swezey as a private joke. None of the parties seriously question the fact Swezey intended her action as anything other than a joke.

This unfortunate incident started on New Year's Day, January 1, 1974, when Swezey decided to prepare some gifts for her friend, Mary Lou Mapes, who was leaving for a two-month training program in Chicago. Swezey prepared a sack full of gifts, some real and some joke gifts. Among the joke gifts was a set of Topeka State Hospital patient records purporting to show Mary Lou Mapes as a patient. The records were official Topeka State Hospital forms that had been completed in a jocular manner. The blank forms were the property of Topeka State Hospital, and Swezey was not authorized to use them in this manner.

The completed record was patently false, and would have been instantly so recognized by anyone having knowledge of the treatment of mental illness or the reputation of Topeka State Hospital. Swezey used the real names of doctors and nurses employed at Topeka State Hospital, and in some cases signed the names of Topeka State Hospital personnel.

The fake patient record, along with other gifts, was given to Mary Lou Mapes at a private luncheon attended only by Mary Lou Mapes and Swezey. Mary Lou Mapes was to leave for Chicago the following Saturday at 6:00 p.m. She had decided that during the time she was in Chicago, she would leave the fake

record with Swezey. On the day she was to leave, she was still running errands at 3:00 p.m., and time was growing short. She decided to leave the fake record with a friend, Julie Jordan, who was to attend a meeting the following Friday night which Swezey also was to attend. It was the intention of Mapes to have Jordan give the record to Swezey at the Friday meeting. Jordan also was to substitute as a speaker for Swezey on Monday evening preceding the Friday meeting, and Swezey had material in her possession to be delivered to Jordan for distribution to those attending the Monday evening meeting. When Mapes arrived at the Jordan house, Julie Jordan was taking a nap and Mapes gave the material to Julie's husband, along with a message for Julie. The message became garbled and Julie Jordan took the fake patient record to the Monday evening meeting and circulated it among those in attendance. Two employees of Topeka State Hospital inspected the record and recognized the name of Mary Lou Mapes as being a person whom they believed to be a defendant or potential defendant in a lawsuit being brought by a friend and co-employee at Topeka State Hospital. Both employees testified they did not hear an announcement that the record was a fake and meant as a joke. Mrs. Jordan testified that she, her husband, and a third person had announced at the time the record was circulated among the 12 to 15 people in attendance that it was a fake and intended as a joke.

The following morning, the record was delivered to Topeka State Hospital authorities. In due time, Swezey learned that the hospital administration was interested in who drew up the record, and she stepped forward and readily admitted her part. She attempted to see Dr. E. G. Burdzik, superintendent of Topeka State Hospital, but was unable to arrange an appointment. On January 14, 1974, Dr. Burdzik personally handed a letter to Swezey notifying her of SRS's intention to dismiss her "for the good of the service" under the provisions of K.S.A. 1976 Supp. 75-2949. Both parties agree that the letter fully complied with the notice requirements of K.S.A. 1976 Supp. 75-2949. At the same time, Swezey gave a letter to Dr. Burdzik which for the first time presented her side of the story to Dr. Burdzik. Dr. Burdzik and Swezey met at 4:00 p.m. on January 22, 1974 for approximately one hour to discuss the issue of Swezey's dismissal.

The following morning, January 23, 1974, Dr. Burdzik deliv-

ered a letter to Swezey terminating her employment effective at 12:00 noon that same day. Dismissal was "for allowing defaming material to be circulated in public which brought discredit to state employees, Topeka State Hospital and the State of Kansas, and misuse of state property. . . ."

On February 1, 1974, Swezey appealed to the Civil Service Commission and hearings were held on March 19 and April 19, 1974. The Civil Service Commission heard evidence and sustained the dismissal of Swezey. Swezey then appealed to the Shawnee County district court. Judge Carpenter examined the record, and in a comprehensive and well-reasoned memorandum ordered that Swezey be reinstated and paid such salary as had been lost by reason of her dismissal.

SRS appeals and relies on three points, to wit:

"1. The District Court erred in failing to remand the matter to the Civil Service Commission for further hearing proceedings.

"2. The District Court erred in misapprehending the facts and the law as to the publication of the mock patient chart and in ruling that there was 'insufficient competent evidence to establish just cause for terminating the employment of Betty Ann (Sic) Swezey "for the good of the service" as provided by K.S.A. 75-2949.'

"3. The District Court erred and exceeded its judicial authority in substituting its judgment on an administrative matter and in basing that judgment on a record that the Court had already declared to be defective."

Points 2 and 3 will be considered together. A brief review of applicable law concerning appellate review of an administrative agency's decision would be useful at this point. The leading case on that issue is *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, 436 P. 2d 828, where it was said:

"A district court may not, on appeal, substitute its judgment for that of an administrative tribunal, but is restricted to considering whether, as a matter of law, (1) the tribunal acted fraudulently, arbitrarily or capriciously, (2) the administrative order is substantially supported by evidence, and (3) the tribunal's action was within the scope of its authority." (Syl. 1.)

This court has the same record before it that the district court had, so this court will make the same review required in *Foote*, supra, to wit:

"In reviewing a district court's judgment, as above, this court will, in the first instance, for the purpose of determining whether the district court observed the requirements and restrictions placed upon it, make the same review of the administrative tribunal's action as does the district court." (Syl. 2.)

Later, in *Shapiro v. Kansas Public Employees Retirement System*, 211 Kan. 452, 507 P. 2d 281, the court held that:

"Whether there is any evidence to support the findings of an administrative agency, or whether the findings are contrary to the evidence, presents a question of law which is always open to review by the courts." (Syl. 7.)

Neither this court nor the district court is to determine the weight or credibility of the testimony of witnesses. These matters are properly left to the commission's discretion.

There is no contention the commission acted fraudulently nor that its action was not within the scope of its authority; thus, it leaves only the questions of whether the commission's action was arbitrary and capricious, and whether it was supported by substantial competent evidence.

K.S.A. 1976 Supp. 75-2949 requires a statement in writing specifically setting forth the reasons for a proposed dismissal. The appointing authority relied on two points in its letter of dismissal to Swezey, to wit: (1) Allowing defaming material to be circulated in public, which material brought discredit to state employees, Topeka State Hospital and the State of Kansas; and, (2) misuse of state property.

Where a statute sets forth the procedure for dismissal and requires that the cause of dismissal be stated in writing, the written statement so made is conclusive of the cause of removal. *People v. Martin*, 19 Colo. 565, 36 Pac. 543 (1894).

Our Supreme Court has not construed that portion of K.S.A. 1976 Supp. 75-2949 which reads, "for the good of the service." The general principle is found in 15A Am. Jur. 2d, *Civil Service* §§ 61, 63, wherein it states:

"A statutory requirement that dismissal from the classified service be for 'the good of the service' has the effect of limiting the valid exercise of the power of dismissal for cause." (p. 87.)

". . . Legal cause for disciplinary action exists if the facts found by the commission disclose that the employee's conduct impairs the efficiency of the public service, but there must be a real and substantial relation between the employee's conduct and the efficient operation of the public service; otherwise, legal cause is not present." (p. 90.)

and, in 63 Am. Jur. 2d, *Public Officers & Employees* § 202, wherein it states:

"Instead of enumerating particular causes for the removal of public officers, their superiors in authority may be empowered to remove them for 'cause.' The

phrase 'for cause' in this connection means for reasons which the law and sound public policy recognize as sufficient warrant for removal, that is, legal cause, and not merely cause which the appointing power in the exercise of discretion may deem sufficient. It has been implied that officers may not be removed at the mere will of those vested with the power of removal, or without any cause. Moreover, the cause must relate to and affect the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public." (p. 752.)

15A Am. Jur. 2d, *Civil Service* § 61, p. 86, states:

"[T]he dismissal of a civil service employee for minor offenses is not favored."

In order to affirm the dismissal of a classified civil service employee, a legal cause must exist; and where no legal cause exists, the dismissal will be held to be arbitrary and capricious.

The record was given to Mary Lou Mapes at a private luncheon, attended only by Swezey and Mapes. Mapes did tell Swezey she would show the record to her two elderly aunts with whom she lived. It is apparent from the testimony that the record was not meant to be circulated in public and that it was not circulated with Swezey's permission. There is no evidence of willful circulation in public and no evidence that Swezey could have reasonably foreseen the record would be circulated in a public meeting.

We pause to note that for many years the Menninger Foundation and Veterans Administration have conducted performances, which were open to the public, wherein good-natured fun was poked at individuals on their staffs and at the psychiatric community. Similar performances are a common practice within many professional groups. Perhaps such events help relieve tension and serve a useful purpose for those who work in demanding and responsible, high-pressure positions. In any event, life surely must be less pleasant for those who are unable to see any humor in their jobs and in the events which occur in connection with their chosen professions.

In this case we have two employees, each of whom had been employed at the same institution for 14 or 15 years. Over the years they shared many humorous events, a number of which would have no meaning to anyone other than themselves. Many of the charts would have no meaning and, in fact, make no sense other than to the two persons involved. There is no evidence that the record was malicious or was intended to be malicious, nor is there

any mention of a real patient. All of the persons who testified on the subject readily admitted they knew immediately upon picking up the record it was a fake and a joke. Why else would you have a picture of the three little pigs fastened to a chart and prescribing a lethal dose of medicine? Perhaps the sense of humor would not appeal to everyone, but no one contends the record was intended to be anything but humorous.

Our research has failed to find a case where a civil service employee has been terminated on comparable facts and counsel has not cited any to the court.

Legal cause for dismissal exists if the facts disclose the employee's conduct is of a substantial nature and directly impairs the efficiency of the public service, but there must be a real and substantial relation between the employee's conduct and the efficient operation of the public service; otherwise, legal cause is not present. Nothing in the record indicates this incident was of a substantial nature directly affecting the rights and interests of the public. Nor do we find that Swezey's conduct impaired the efficiency of the Topeka State Hospital. Legal cause for Swezey's dismissal is not found on the issue of public circulation of the record, and was not "for the good of the service" as required by K.S.A. 1976 Supp. 75-2949; nor is there evidence substantially supporting the administrative order.

We now turn to Swezey's misuse of state property. Misuse of state property referred to a single set of state forms which ordinarily would be found in a patient's record at Topeka State Hospital. Courts have affirmed the dismissal of a civil service employee where notable quantities of property and personnel were used for personal gain on a recurring basis, causing delay and postponement of official work. (Lee v. Department of Highways, 138 So. 2d 36 [La. App. 1962].) The record was prepared at home and did not involve the use of state time or personnel, nor did it involve personal gain. The misuse or waste of state property is not condoned by this court, but is viewed as an offense which is no more serious than the misuse of a paper clip, rubber band, or a few sheets of paper. It is not the type of conduct which would justify the dismissal of a permanent classified employee who has 14 years of service. We note Swezey was neither charged with nor convicted of any crime concerning her use of the forms. Each case of alleged misuse of state property relied on for the dismissal

of a permanent classified civil service employee must be considered on its own set of facts. The misuses of state property on this set of facts does not amount to a legal cause, and thus the dismissal was not "for the good of the service" as required by K.S.A. 1976 Supp. 75-2949.

We now turn to appellant's final point that the district court erred in failing to remand the matter to the Civil Service Commission for further hearing proceedings. Both parties agree there were due process deficiencies in the Civil Service Commission hearing. The district court so found and there was no appeal from that portion of the district court judgment. Appellant urges that the matter be remanded for further proceedings. Appellee urges that appellant had the burden of proof insofar as making out a prima facie case as to the reasonableness of the appointing authorities' action in dismissing appellee; and, so to speak, the appellee's argument is that appellant, having failed, should not be permitted to try again. It should not now be allowed another turn at bat, thereby receiving six strikes rather than the customary three.

Appellant introduced and offered all of the evidence it desired to introduce and rested. All of the evidence was considered by the Civil Service Commission and all of the evidence was before the district court. No one alleges the SRS was denied due process of law in presenting its case. SRS was not denied the opportunity to offer evidence, nor was SRS prejudiced in any way from presenting its case. It was appellee who was denied the right to fully cross-examine SRS's witnesses, who was denied the right to introduce evidence on her behalf, and to rebut evidence considered by the commission.

This court will not require the parties to do a useless act. SRS had its day in court and presented all the evidence it desired to present. We assume the appellee, Swezey, would not offer evidence adverse to her interest; therefore, there is no point in sending the case back to the Civil Service Commission for further hearing to afford the employee a due process hearing when SRS has failed, as a matter of law, to sustain its burden of proof that the dismissal of the employee "for the good of the service" was reasonable.

The determination made by the trial court was within the scope of its review in considering administrative decisions (*Strader v.*

*Kansas Public Employees Retirement System*, 206 Kan. 392, 479 P. 2d 860, cert. denied, 403 U.S. 914, 29 L. Ed. 2d 692, 91 S. Ct. 2240 [1971]) when it determined there was insufficient competent evidence to establish just cause for terminating the employment of Betty A. Swezey, and as a result thereof the board's action constituted arbitrary, capricious and unreasonable conduct.

The district court properly concluded Betty A. Swezey was entitled to be reinstated and be paid such salary as had been lost by reason of such dismissal as provided in K.S.A. 1976 Supp. 75-2949.

Affirmed.