(850 P.2d 928)

No. 67,446

S. Sakuntala Dutta, M.D., *Appellee/Cross-Appellant*, v. St. Francis Regional Medical Center, Inc., *Appellant/Cross-Appellee*.

Opinion filed April 16, 1993.

*Richard C. Hite*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, and *Charles E. Hill*, of Wichita, for appellant/cross-appellee St. Francis Regional Medical Center, Inc.

*John P. Woolf* and *Eric B. Metz*, of Triplett, Woolf & Garretson, of Wichita, for appellee/cross-appellant S. Sakuntala Dutta, M.D.

*Jeffrey O. Ellis* and *Laura J. Bond*, of Lathrop & Norquist, of Overland Park, and *Thomas L. Bell*, of the Kansas Hospital Association, of Topeka, for *amicus curiae* The Kansas Hospital Association.

*Ronald Williams*, of Morrison & Hecker, of Wichita, *Paul G. Gebhard*, *Barry Sullivan*, and *Jeffrey T. Shaw*, of Jenner & Block, of Chicago, and *Thomas W. Greeson*, of The American College of Radiology, of Reston, Virginia, for *amicus curiae* The American College of Radiology.

Before LARSON, P.J., LEWIS, J., and BARRY A. BENNINGTON, District Judge, assigned.

BENNINGTON, J.: This action by S. Sakuntala Dutta, M.D., against St. Francis Regional Medical Center, Inc., (hospital) seeks damages for an alleged breach of an employment contract. Before trial, the trial court granted the hospital's motion for summary judgment, finding the doctor was not entitled to a "due process hearing" under the provisions of the hospital bylaws, and the doctor cross-appeals from this ruling. The jury awarded Dutta $552,756 for breach of the written contract, and the hospital appeals this award. Dutta cross-appeals the summary judgment granted to the hospital on her due process claim.

Dutta is a radiologist who began working in the radiology department of the hospital July 1, 1987, as an employee of Dr. Maurice Krause, the medical director of the hospital's radiology department. The hospital terminated Dr. Krause's employment as medical director on August 5, 1988, but encouraged Dutta to remain with the hospital. On August 8, 1988, Dutta and the hospital entered into a written employment contract with a primary term of 90 days. If a new medical director had not been hired by the hospital within the 90-day period, the agreement was to be automatically extended for a second 90-day period.

Following a period of recruitment and interviews, the hospital offered Dr. Donald Tan the position of medical director of the radiology department on October 5, 1988. Dr. Tan and the hospital executed a contract on April 24, 1989, making Dr. Tan the medical director of the radiology department. The contract granted Dr. Tan the right "to provide radiation oncology services on an exclusive basis" subject to the exception of allowing Dutta

to continue her practice of radiation oncology at the hospital. On April 24, 1989, the hospital notified Dutta the 90-day contract had expired and Dr. Tan was the new medical director. The letter provided in part:

"It is our intent at this time to establish an exclusive contract with Dr. Donald C-S Tan for medical direction and radiation therapy services at SFRMC. Your medical staff privileges to practice radiation therapy at SFRMC will not be affected by this action. You will be allowed to maintain your current office space for radiation oncology activities; however, you should make alternative arrangements for your billing and collection activities."

Dutta and Dr. Tan practiced independently of each other in the same facility, but Dr. Tan was unhappy with this arrangement. Dr. Tan requested exclusive privileges on October 13, 1989, stating he could not continue as medical director without exclusivity.

An exclusive contract was authorized by the hospital and Dutta was notified on February 2, 1990, she would not be permitted to provide radiation therapy services at the hospital after May 1. By letter, Dutta twice requested a hearing on the hospital's decision to revoke her right to use hospital facilities. Both requests were denied.

Dutta's last day at the hospital was May 1, 1990. Just before she left the hospital, she began working two days per week at a hospital in Halstead. While at Halstead, Dutta learned of an opening at the Hutchinson Clinic in Hutchinson. Dutta interviewed for the position and agreed to work three days a week at the clinic. Dutta signed an agreement with the Hutchinson Clinic on June 18, 1990. Sometime in August of 1990, she terminated her employment at Halstead. Dutta worked full time at the Hutchinson Clinic from August of 1990 through June of 1991. At that time, although her work had been satisfactory, the Hutchinson Clinic replaced Dutta with another physician.

Dutta presented evidence about the purpose of the requirement in her contract with the hospital that the new medical director be mutually acceptable to both parties. Dutta stated she informed Douglas Stanley, the attorney who represented her in contract negotiations with the hospital, that the new medical director "has to be compatible, you know, I have to like that

person, I should feel comfortable to work with him." Doug Stanley testified the "mutually acceptable" language in Dutta's contract referred to "her entering into a business relationship, a partnership with the person coming in. That was the whole discussion in terms of mutually acceptable. There was never any discussion . . . about medical credentials of the person." Lynn Zatzkin, a hospital administrator, testified the parties included phrase "mutually acceptable" in the contract because "[w]e both agreed that we wanted the person being recruited to be compatible with Dr. Dutta."

Dutta admitted she understood her contract with the hospital obligated her to negotiate a business relationship with the new director in good faith. Dutta further indicated it is standard practice among physicians who are establishing business relationships to set up an employer-employee relationship for at least a year before a partnership is formed. Dutta emphasized, however, at the time of the negotiations with the hospital, she had already been employed by Dr. Krause for a year and had discussed forming a partnership with him. Dutta believed, based on her prior year of service at St. Francis, the new medical director should be required to form a partnership with her immediately.

The facts regarding Dutta's compensation are these: When Dutta began working at the hospital as an employee of Dr. Krause, her contract provided a salary of $150,000 per year. The August 1988 agreement with the hospital provided Dutta was to receive $2,000 per month from the hospital and be allowed to retain all of the billings she generated through the treatment of patients. Dutta's tax accountant, Gary Freeman, testified Dutta's earnings between August of 1988 and May of 1990 averaged $30,880 per month or $370,560 per year. Dutta's accountant estimated she earned $286,512 during the year she worked at Hutchinson.

Dr. Carl Bogardus, Chairman of the Department of Radiation Therapy at the University of Oklahoma, testified regarding Dutta's probable loss of future income. Bogardus indicated as a result of her termination, Dutta would suffer approximately $648,480 in lost income. Bogardus' opinion was it would take Dutta at least one year to find comparable employment to that which she had lost at the hospital and during that year she would have no

income. In response to a question about Dutta's probable earnings after finding a job, Dr. Bogardus replied:

"Well, it obviously is a steadily increasing number. You start on day one with no income and the income gradually builds up. By the end of your first year you would be making about half your potential income. By the end of the second year you would probably at least be making three-quarters and on into full income by the end of your third year."

The appeal and cross-appeal present five issues for this court to resolve.

## DENIAL OF DUE PROCESS HEARING

Count I of plaintiff's petition alleges: "Medical Center, in failing to grant Dr. Dutta a hearing pursuant to the Medical Staff Bylaws, has denied Dr. Dutta due process, in violation of the United States Constitution, the Constitution of the State of Kansas, and by common law." The trial court granted the hospital's motion for summary judgment, dismissing count I of plaintiff's petition before trial. Did the trial court err in granting the hospital's motion for summary judgment?

The rules governing the availability of summary judgment are well known and were most recently stated in *Mills v. City of Overland Park*, 251 Kan. 434, 436, 837 P.2d 370 (1992).

"Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When a summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment."

None of the parties claim any genuine issue of material fact which would bar summary judgment. Whether the bylaws constitute a contract of employment is not an issue in this case as the hospital admits it is bound by its own bylaws. The only issue is whether the hospital bylaws required a hearing before a committee of the medical staff prior to the hospital decision to revoke Dutta's right to use the facilities and equipment of the radiology department.

Although neither Dutta nor the hospital contend the bylaws are ambiguous, both ask the court to interpret the bylaws in a manner which supports their respective positions. "Whether an

instrument is ambiguous is a matter of law to be decided by the court. As a general rule, if the language of a written instrument is clear and can be carried out as written, there is no room for rules of construction." *Godfrey v. Chandley*, 248 Kan. 975, Syl. ¶ 2, 811 P.2d 1248 (1991).

Dutta contends the creation of an exclusive contract which infringes upon her due process and contractual rights specifically granted her by the bylaws creates a cause of action for breach of contract. The remedy she seeks is a declaratory judgment requiring a due process hearing before any of her medical staff privileges are violated.

The hospital responds Dutta's medical staff privileges are in full force and effect. The hospital believes it is entitled to deny Dutta the use of the equipment in the radiation therapy department and that this denial has nothing to do with the establishment of Dutta's staff privileges or her right to a hearing pursuant to the bylaws.

The following article and sections of the Medical Staff Bylaws identify those practitioners who have a right to a hearing.

"ARTICLE VII: HEARING PROCEDURE

"Section 1. Right to Hearing.

"a. Any practitioner who receives notice of a recommendation of the Executive Committee or the Board of Directors, if it initiated the recommendation, that will adversely affect his appointment to or status as a member of the Medical Staff or his exercise of clinical privileges will be entitled to a hearing before an ad hoc committee of the Medical Staff, except as otherwise so provided in the Bylaws.

"b. The practitioner who receives notice of a decision by the Board of Directors without recommendation of the Medical Executive Committee or that is contrary to a decision by the Executive Committee or that is contrary to a decision by the Executive Committee and will adversely affect his appointment to or status as a member of the Medical Staff or his exercise of clinical privileges will be entitled to a hearing by a committee appointed by the Board of Directors.

. . . .

"Section 6. Conduct of Hearing.

"j. The hearing provided for in these Bylaws is for the purpose of resolving, on an intra-professional basis, matters bearing on professional competency and conduct.

. . . .

"Section 7. Fair Hearing Provision: Applicable to Medico-Administration Practitioners

"Any practitioner engaged by the Medical Center in a medico-administrative position will be requested to become an appointee of the Medical Staff in the manner followed by all other applicants. All provisions of the Fair Hearing Process will apply to such practitioner, except in the event of termination. In the event of the termination of his contract, no practitioner will have his Medical Staff privileges terminated without the same fair hearing process afforded any other appointee of the Medical Staff, unless it is otherwise so provided in the contract."

Dutta is a well-qualified, competent doctor. At no time has the hospital alleged or contended Dutta's medical staff membership or clinical privileges have been revoked or terminated. However, the hospital has denied Dutta the use of the department's equipment and facilities used in providing radiation therapy or therapeutic radiology as the result of entering into an exclusive contract with Dr. Tan. Even though the exclusive contract deprived Dutta access to the hospital's radiology facilities, Dutta still had the authority to admit patients to the hospital and to prescribe treatment. She did not have the authority to administer treatment personally.

The hospital revoked Dutta's access to its facilities because the medical director of radiology demanded an exclusive services contract. This was the arrangement at the hospital when Dr. Tan arrived. The hospital's decision was not based upon Dutta's competency but upon an established business practice.

The trial judge properly identified and correctly relied upon Section 6(j) of Article VII of the Medical Staff Bylaws in the ruling on the motion for summary judgment. "The hearing provided for in these Bylaws is for the purpose of resolving, on an intra-professional basis, matters bearing on professional competency and conduct." The decision to grant Dr. Tan an exclusive contract to provide radiology services and to ban Dutta from using the facilities does not affect Dutta's status as a member of the medical staff or her opportunity to exercise clinical privileges. Therefore, Dutta is not entitled to a fair hearing procedure under the provisions of the bylaws.

Other courts have arrived at the same result when considering hospital bylaws which provide for a hearing only in those instances where a physician is terminated based upon professional incompetence or unethical behavior. The Eighth Circuit Court of Ap-

peals held in *Engelstad v. Virginia Mun. Hosp.*, 718 F.2d 262, 268 (8th Cir. 1983):

"The bylaws' procedural requirements were intended only to cover cases where a doctor's privileges have been reduced or terminated, which is typically the results of complaints regarding the doctor's professional competence or ethical behavior. Those procedures were not intended to cover cases, like the present one, where the use a doctor can make of his staff privileges has been incidentally affected by the hospital's administrative decision to terminate a personal service contract with the hospital. Dr. Englestad's staff privileges guaranteed him only the authority, not the wherewithal, to practice his profession. His authority to practice his profession at the hospital has not been reduced or terminated, but remains intact."

The Maryland Court of Special Appeals held in a similar factual setting:

"It seems clear to us that this procedure presupposes notification to the practitioner that he has failed in his duties to the Hospital, his patients, or in the competent practice of medicine. Obviously a doctor faced with charges of this kind must be given a due process opportunity to defend himself. The case here at bar, however, does not fit into that category. . . . Appellees concede that the Hospital had a legal right to enter into an exclusive contract with Friedman and his professional association to provide the services required to implement the newly formed Department of Imaging. It necessarily follows that under these circumstances the Hospital had no obligation to grant privileges to radiologists who might compete with the Friedman Association.

. . . .

". . . No suggestion is made that the radiologists were in any way incompetent or failed to conduct themselves properly while their contract with the Hospital was in effect. There is nothing to defend [at any proposed hearing]. The facts are that an exclusive contract with Frazier P.A. has expired and a new exclusive contract has been negotiated with Friedman's P.A." *Anne Arundel Gen. Hosp. v. O'Brien*, 49 Md. App. 362, 371-73, 432 A.2d 483 (1981).

The California Court of Appeals has held:

"Although most of the reported cases deal primarily with 'fair procedure' problems in relation to adjudicatory decisions, there can be no doubt that, because denial of staff membership may effectively impair a physician's right fully to practice his profession, neither a private nor public hospital may unreasonably or arbitrarily exclude a physician otherwise qualified from membership on its staff. [Citations omitted.] However, it does not necessarily follow that the governing authority of a hospital may not make a policy decision or adopt a rule of general application that certain facilities shall be operated by the hospital itself through an arrangement with one or more

physicians to the exclusion of all members of the staff except those who may be coincidentally employed in such operation. [Citation omitted.] Indeed, in every case brought to our attention in which a hospital's operation of a facility on a 'closed-staff' basis was challenged, the decision of the governing authority of the hospital has been upheld." *Lewin v. St. Joseph Hospital of Orange*, 82 Cal. App. 3d 368, 391, 146 Cal. Rptr. 892 (1978).

Although without employment by the hospital or the medical director Dutta's staff privileges may be of little or no value, the fact remains Dutta's staff privileges reflect the hospital's decision Dutta is qualified to practice.

Dutta also contends the hospital's act is a matter "bearing on professional competency and conduct" under Section 6(j) of Article VII. Dutta argues professional conduct means the use of the radiology equipment and therefore she is entitled to a hearing. This interpretation would mean a physician could demand a hearing anytime the hospital made a change in equipment or facilities or terminated an existing program or added a new program. Dutta's interpretation is unreasonable. The law favors reasonable rather than unreasonable interpretations of written instruments. *Pottratz v. Firkins*, 4 Kan. App. 2d 469, 471, 609 P.2d 185 (1980).

Dutta further contends she is entitled to a hearing under section 7 of Article VII. This section applies only to those physicians who are jointly engaged in medical and administrative activities. There is no evidence Dutta was engaged in administrative activities. This contention is without merit as the terms of Dutta's employment contract specify therapeutic radiology services and makes no mention of administrative responsibilities.

Finally, Dutta argues she is entitled to a hearing because the hospital's action had an adverse effect on her "exercise of clinical privileges" protected by Article VII, Section 1(a). In support of this position, Dutta relies upon *Lewisburg Community Hosp. v. Alfredson*, 805 S.W.2d 756 (Tenn. 1991). In the present case, the hospital's bylaws limit a physician's right to a hearing to those matters bearing on professional competency and conduct. This limitation is not found in the bylaws construed in the *Lewisburg* case. Furthermore, the bylaws at issue in *Lewisburg* required the hospital to grant the use of certain facilities to physicians who had been granted clinical privileges in a particular specialty. No such provision exists in the bylaws in this case.

Article VII of the hospital bylaws, when considered in its entirety, provides that a practitioner who receives notice adversely affecting his or her status as a member of the medical staff or the exercise of his or her clinical privileges is entitled to a hearing, if the basis for the adverse decision relates to a practitioner's professional competency and conduct. Because the hospital's decision to revoke Dutta's access to its radiology facilities was based upon business decisions and necessity and not related to her competency as a physician, the bylaws of the medical center do not entitle her to a hearing.

## BREACH OF ORAL AND IMPLIED CONTRACT

At the conclusion of Dutta's case in chief and again at the end of the trial, the hospital moved for a directed verdict on Dutta's claims of oral and implied contract. The trial court denied both motions. The jury concluded there was no breach of oral or implied contract between the parties. The hospital claims the trial court erred in denying its motion for directed verdict on these claims.

Assuming the trial court did err, such error is rendered harmless by the jury's verdict in favor of the hospital on these points. "Harmless error is error which does not prejudice the substantial rights of a party. It affords no basis for a reversal of a judgment and must be disregarded." *Tamplin v. Star Lumber & Supply Co.*, 251 Kan. 300, Syl. ¶ 3, 836 P.2d 1102 (1992). Because the hospital ultimately prevailed on the issue, its substantial rights were not prejudiced by the ruling of the trial court.

## AMBIGUOUS CONTRACT PROVISION

During the course of the trial, the trial court was called upon to determine whether certain language in paragraph four of the employment contract between the hospital and Dutta was ambiguous. This ruling was necessary to determine whether parol evidence would be admitted regarding the contract.

Relying upon *NEA-Goodland v. USD No. 352*, 13 Kan. App. 2d 558, 562, 775 P.2d 675, *rev. denied* 245 Kan. 785 (1989), the trial court ruled as follows:

"I find, therefore, in this case the term 'mutually acceptable' is capable of more than having one meaning. It could mean mutually acceptable as to

the person being interviewed, medical background, or it could mean mutually acceptable as a human basically or can I get along with him, etc. etc.

"So I am going to find that clause is ambiguous following the case I previously cited."

The language in a contract is ambiguous if the words in the contract are subject to two or more possible meanings. The determination of whether a contract is ambiguous is a question of law. *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.,* 243 Kan. 130, 133, 754 P.2d 803 (1988). Regardless of the construction given a written contract by the trial court, on appeal a contract may be construed and its legal effect determined by the appellate court. *Mark Twain Kansas City Bank v. Cates,* 248 Kan. 700, 704, 810 P.2d 1154 (1991).

Paragraphs four and five of the hospital's employment agreement with Dutta dated August 8, 1988, read as follows:

"4. During the term of this Agreement the Medical Center shall be actively recruiting for a full-time Medical Director for the Radiation Therapy department or a one-half time radiation therapist. Dr. Dutta shall be involved in the interviewing process. The person selected for either of the above positions shall be mutually acceptable to the Medical Center and Dr. Dutta. Dr. Dutta may discuss potential business arrangements with each individual interviewed.

"5. Once the full-time Medical Director or part-time radiation therapist is selected, Dr. Dutta will, in good faith, attempt to reach a satisfactory business arrangement with the selected individual."

Dutta argues the purported ambiguity of the agreement arises because there is uncertainty whether the phrase "mutually acceptable" refers to qualifications and compatibility of medical director candidates, or willingness of such person to enter into a business arrangement satisfactory with Dutta. The hospital, on the other hand, argues the proper basis for determining acceptability is the "person" alone and not the willingness to enter into a business arrangement with Dutta.

We find the phrase to be ambiguous. An individual's acceptability could be based upon a number of different criteria such as academic background, work history, personal characteristics, or an expression of his or her willingness to form an acceptable business arrangement with Dutta. The mere fact the contract gives Dutta the option to discuss potential business arrangements does not exclude that consideration as a basis of mutual accept-

ability. There is no conflict or contradiction between Dutta's interpretation of "mutually acceptable" and other provisions of the contract. Paragraph five directs Dutta to negotiate in good faith to reach a satisfactory business arrangement with the individual selected. There is nothing in this obligation preventing Dutta from declaring a candidate unacceptable if she perceives a satisfactory business arrangement would be impossible to achieve.

Given the phrase "mutually acceptable" can be construed to have multiple meanings and the contract as a whole does not clarify which is the proper meaning, the trial court did not err in finding the term to be ambiguous.

### DIRECTED VERDICT ON BREACH OF WRITTEN CONTRACT WAS PROPERLY DENIED AND JURY VERDICT AS TO BREACH WAS BASED ON SUBSTANTIAL COMPETENT EVIDENCE

At the close of Dutta's case in chief and at the end of the trial, the hospital moved for a directed verdict on Dutta's claim the hospital had breached its written employment contract by hiring a medical director who was not mutually acceptable to both parties. The trial court denied both motions. The hospital alleges it was error for the trial court to deny its motion for directed verdict.

In *Turner v. Halliburton Co.*, 240 Kan. 1, Syl. ¶ 1, 722 P.2d 1106 (1986), the Kansas Supreme Court set forth the following rules regarding motions for directed verdict:

"K.S.A. 60-250 allows a litigant to move for a directed verdict, and for judgment notwithstanding the verdict. In ruling on a motion for directed verdict pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought and where reasonable minds could reach different conclusions based on the evidence the motion must be denied and the matter submitted to the jury. This rule must also be applied when appellate review is sought on a motion for directed verdict. The same test is applicable to a motion for judgment notwithstanding the verdict."

The hospital claims the trial court erred for the following reason. Dutta found Dr. Tan to be unacceptable only because of his refusal or failure to enter into a business relationship of which she approved. The hospital contends this was not a proper basis for finding Dr. Tan to be unacceptable. We have already ruled the terms of the contract are ambiguous. Therefore, the jury

would be justified in finding Dutta could have rejected Dr. Tan on the basis he failed to enter into a business agreement if there was evidence to support that point of view. The testimony of Dutta, the hospital administrator, and the attorney who represented Dutta in contract negotiations, when viewed in the light most favorable to Dutta, provides a factual basis for the jury to find the phrase "mutually acceptable" in the contract was intended by Dutta to ensure the hospital would select a medical director who has indicated a willingness to form a partnership or otherwise acceptable business relationship.

When the evidence pertaining to the terms of a contract is conflicting or admits of more than one inference, a question is presented for the trier of fact. *Hays v. Underwood, Administrator*, 196 Kan. 265, 267, 411 P.2d 717 (1966). The meaning of the mutually acceptable clause in the contract was ambiguous and the trial court did not err in allowing the jury to decide the factual issues concerning the meaning of the clause and whether the hospital breached the provisions of the written contract.

There was substantial competent evidence upon which the jury verdict of breach of contract could be based. "Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved." *Williams Telecommunications Co. v. Gragg*, 242 Kan. 675, 676, 750 P.2d 398 (1988).

Although the evidence was conflicting, such conflicts are properly resolved by the finder of fact, which in this case was a properly instructed jury. *Carter v. Koch Engineering*, 12 Kan. App. 2d 74, 86, 735 P.2d 247, *rev. denied* 241 Kan. 838 (1987).

Because the jury has properly determined that the hospital breached its contract with Dutta, the only remaining issue subject to determination is whether the evidence was sufficient to justify the award of damages made herein.

## DAMAGES

First, the hospital contends Dutta offered insufficient evidence to allow the jury to determine Dutta's damages.

In *Venable v. Import Volkswagen, Inc.*, 214 Kan. 43, 50, 519 P.2d 667 (1974), the Kansas Supreme Court stated:

"One who claims damages on account of a breach of contract must not only show the injury sustained, but must also show with reasonable certainty the amount of damage suffered as a result of the injury or breach. [Citation omitted.] In order for the evidence to be sufficient to warrant recovery of damages there must be some reasonable basis for computation which will enable the jury to arrive at an approximate estimate thereof. [Citations omitted.]"

The testimony of Dutta, Gary Freeman, and Dr. Bogardus provides a reasonable basis from which the jury could compute an approximate estimate of Dutta's damages. We hold the trial court did not err in refusing to grant a directed verdict in favor of the hospital on the grounds Dutta failed to provide sufficient evidence from which the jury could calculate her damages.

Finally, the hospital contends if it did breach its contract with Dutta, the jury's verdict was excessive and not supported by the evidence. The hospital argues it is not responsible for any decrease in Dutta's income which occurred after she began working at the Hutchinson Clinic. The hospital's position is that Dutta completely mitigated her damages by accepting employment within weeks of her termination by the hospital. Dutta, on the other hand, argues her Hutchinson employment was an effort to mitigate her damages by providing her temporary relief and she still faces the loss of income described by Dr. Bogardus.

When a verdict is attacked for insufficiency of the evidence, the duty of the appellate court extends only to a search of the record for the purpose of determining whether there is any competent substantial evidence to support the findings. The appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under the circumstances, the reviewing court must view the evidence in the light most favorable to the party prevailing below. "Substantial evidence" as previously defined is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, Syl. ¶¶ 1, 2, 681 P.2d 1038 (1984). Since the issue of damages is a difficult one to calculate, the law has given juries great leeway in this area. *Ratterree v. Bartlett*, 238 Kan. 11, Syl. ¶ 12, 707 P.2d 1063 (1985).

In conformity with these rules, we now consider the evidence in the light most favorable to Dutta.

Dr. Bogardus calculated Dr. Dutta's damages to be $648,480. This calculation was made without any reference to Dr. Dutta's earnings at Halstead and Hutchinson. There is no evidence from which the jury could find an amount larger than that calculated by Dr. Bogardus.

"It is a general principle of law that where a party has been injured by a breach of contract, he is under a duty to minimize his damages to the extent that is reasonably possible under the circumstances then existing." *Cain v. Grosshans & Petersen, Inc.*, 196 Kan. 497, Syl. ¶ 3, 413 P.2d 98 (1966). Dutta worked at Halstead and at the Hutchinson Clinic for 13 months, from May of 1990 through June of 1991. Dutta's accountant, Freeman, testified that based on her income during the last four months of 1990, she earned $286,512 during the year she worked in Hutchinson. This considerable and immediate effort of Dutta to mitigate her damages by finding alternative employment has a direct bearing on the amount of damages she actually experienced as a result of the hospital's breach of contract.

When the maximum amount of Dutta's damages is reduced by the mitigating earnings at Halstead and Hutchinson, the jury's verdict exceeds the amount supported by substantial competent evidence. The plaintiff should not be allowed to recover damages which have in fact been mitigated or reduced. The evidence, viewed in the light most favorable to Dutta, does not support the jury's verdict as to the damages awarded.

The jury's verdict as to damages is reversed. We affirm the trial court and the jury verdict as to all other issues. The case is remanded to the trial court for a new trial on the issue of damages only.